1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT EVERETT JOHNSON,

11          Petitioner,                    No. CIV S-05-0385 DFL GGH P

12      vs.

13   CLAUDE E. FINN, et al.,               <u>ORDER AND</u>

14          Respondents.                   <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16   I. <u>Introduction</u>

17          Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In 1977 petitioner was convicted in San Diego

19   County of first degree murder and sentenced to life with the possibility parole.  In the instant

20   petition, petitioner challenges the December 2001 decision by former Governor Gray Davis to

21   reverse the August 2001 decision by the California Board of Prison Terms (BPT) finding him

22   suitable for parole.  The 2001 hearing was petitioner's twelfth suitability hearing.

23          This action is proceeding on the amended petition filed July 19, 2005, which

24   challenges the Governor's decision to reverse the BPT on the following grounds:  1) the decision

25   lacked individualized consideration; 2) the decision was made pursuant to an illegal "no parole"

26   policy; 3) the decision was not supported by some evidence; 4) the decision violated petitioner's

1

1   plea agreement; 5) the decision violated the Ex Post Facto Clause and constituted a bill of

2   attainder; 6) petitioner's continued incarceration violates the Eighth Amendment.

3           Where appropriate, district courts may decline to address all claims raised in a

4   habeas corpus petition.  See Phillips v. Vasquez, 56 F.3d 1030, 1036 (9th Cir. 1995), citing

5   Blazak v. Ricketts, 971 F.2d 1408 (9th Cir. 1992).  After reviewing the record, the court has

6   determined that it will only review petitioner's claim challenging the sufficiency of the evidence,

7   because this claim has merit.  The court declines to review the remaining claims for the following

8   reasons.

9           Petitioner's claim alleging that the Governor's decision lacked individualized

10  consideration appears to be encompassed by his claim alleging insufficient evidence.  For that

11  reason, the court declines to separately address this claim.  Petitioner's claims that the

12  Governor's decision violates his plea agreement and that his continued incarceration violates the

13  Eighth Amendment may be more appropriately raised in the district where petitioner was

14  convicted, i.e. the United States District Court for the Southern District of California, because

15  these claims more directly concern the validity of his conviction.  For this reason, the court

16  declines to address these claims.  The court declines to address petitioner's claim alleging that

17  the Governor's decision was made pursuant to an illegal "no parole policy" because such a claim

18  is problematic and most likely unmeritorious.  See In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.

19  Rptr. 2d 104 (2002) (the California Supreme Court found no evidence of a "no parole" policy).

20          Finally, the court declines to address petitioner's claims that the Governor's

21  decision violated the Ex Post Facto Clause and constituted an illegal bill of attainder because

22  these claims are without merit.  See Johnson v. Gomez, 92 F.3d 964 (9th Cir. 1996) (Cal. Penal

23  Code § 3041.2, which authorizes the Governor to reverse BPT decisions to grant or deny parole,

24  does not violate the the Ex Post Facto Clause); see Nixon v. Administrator, 433 U.S. 425, 468,

25  97 S. Ct. 2777, 2803 (1977) (defining bill of attainder as an act of legislative outlawry that

26  imposes disabilities on an individual on account of his misconduct, but without a trial.).

1    On September 29, 2005, petitioner filed a motion for partial summary judgment as

2    to his claim that the Governor's decision was not supported by some evidence.  Petitioner's

3    motion is vacated as unnecessary.  On August 15, 2005, petitioner filed a motion for discovery.

4    Petitioner seeks discovery regarding his claim concerning the alleged no-parole policy and his

5    claim alleging violation of the Ex Post Facto Clause.  Because the court declines to address these

6    claims, the motion for discovery is denied as unnecessary.

7    After carefully reviewing the record, the court recommends that the petition be

8    granted on grounds that the Governor's decision to reverse the BPT was not supported by

9    sufficient evidence.

10   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

11   The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

12   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

13   138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).  The AEDPA "worked

14   substantial changes to the law of habeas corpus," establishing more deferential standards of

15   review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

16   defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

17   1997).

18   In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

19   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

20   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

21   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

22   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

23   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

24   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

25   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

26   \\\\\

3

1    "Unreasonable application" of established law, on the other hand, applies to

2    mixed questions of law and fact, that is, the application of law to fact where there are no factually

3    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

5    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

6    deference is not blindly automatic, "the most important point is that an *unreasonable* application

7    of federal law is different from an incorrect application of law....[A] federal habeas court may not

8    issue the writ simply because that court concludes in its independent judgment that the relevant

9    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

10   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

11   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

12   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

13   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

14        The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

16   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

17   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

18   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

19   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

20   established Supreme Court authority reviewed must be a pronouncement on constitutional

21   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

22   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

23        However, where the state courts have not addressed the constitutional issue in

24   dispute in any reasoned opinion, the federal court will independently review the record in

25   adjudication of that issue.  "Independent review of the record is not de novo review of the

26   constitutional issue, but rather, the only method by which we can determine whether a silent state

1  court decision is objectively unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.

2  2003).

3  III.  <u>Discussion</u>

4       A.  <u>Liberty Interest in Parole</u>

5       At the outset, respondent argues that the petition should be denied because

6  petitioner does not have liberty interest in parole.  For the following reasons, the court finds that

7  petitioner has a clearly established liberty interest in parole.

8       Although due process does not require the existence of a parole scheme,

9  California has established one.  Not all of the myriad procedures of the parole setting system are

10  pertinent here.  The court sets forth that part of the statutory section that is pertinent:

11       (a) In the case of any prisoner sentenced pursuant to any provision of law, other
than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board

12  of Prison Terms shall meet with each inmate during the third year of
incarceration for the purposes of reviewing the inmate's file, making

13  recommendations, and documenting activities and conduct pertinent to granting
or withholding postconviction credit.  One year prior to the inmate's minimum

14  eligible parole release date a panel consisting of at least two commissioners of
the Board of Prison Terms shall again meet with the inmate and shall normally

15  set a parole release date as provided in Section 3041.5. The panel shall consist
solely of commissioners or deputy commissioners from the Board of Prison

16  Terms.

17  The release date shall be set in a manner that will provide uniform terms for
offenses of similar gravity and magnitude in respect to their threat to the public,

18  and that will comply with the sentencing rules that the Judicial Council may
issue and any sentencing information relevant to the setting of parole release

19  dates. The board shall establish criteria for the setting of parole release dates and
in doing so shall consider the number of victims of the crime for which the

20  prisoner was sentenced and other factors in mitigation or aggravation of the
crime.

21

22  Cal. Penal Code § 3041.

23       In compliance with the statutory mandate, the Board of Prison Terms issued

24  regulations which guide it in finding prisoners convicted of life offenses with parole eligibility

25  for parole setting. Cal. Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether

26  an inmate is suitable for parole.  Section 2402(a) provides that regardless of the length of time

served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Section 2402(c) sets forth the circumstances tending to show unsuitability. The court lists those of significance here:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

The Ninth Circuit has held that California's parole scheme gives rise to a cognizable liberty interest in release on parole.  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  Respondent argues that the California Supreme Court recently found that Cal. Penal Code § 3041 is not mandatory and does not create a presumption that parole will be granted.  In re Dannenberg, 34 Cal.4th 1061, 1084, 1087-88 (2005).  Respondent argues that the California Supreme Court's decision in Dannenberg is not an unreasonable application of clearly established Supreme Court.  Pursuant to Dannenberg, respondent argues that petitioner has no liberty interest in parole.

The undersigned must relate that a district judge of this court believes that the California parole scheme for indeterminate sentences does not create a federal liberty interest. Sass v. Cal. Board of Prison Terms, 376 F.Supp. 2d 975 (E.D. Cal. 2005) (Honorable Morrison England).  In Sass, Judge England found that no federal liberty interest was created because the wording of the parole statute, Cal. Penal Code 3041(a) ("a panel *shall normally* set a release

7

1   date..) and §3041(b) ("the panel...*shall set* a release date...." was insufficiently mandatory.  Judge

2   England relied heavily on In re Dannenberg, 34 Cal. 4th 1061, 1098, 23 Cal. Rptr. 3d 417, 443

3   (2005).  However, even assuming that the "old" Supreme Court paradigm regarding creation of a

4   liberty interest (mandatory act and underlying factual predicates) remains the analytical

5   framework in which to judge the creation of right-to-parole liberty interests, see e.g., Board of

6   Pardons v. Allen, 482 U.S. 369, 378, 107 S.Ct. 2415, 2421(1987) (mandatory language in a

7   parole statute creates a "presumption of release" and gives rise to a liberty interest), California

8   law, both before and after Dannenberg finds that the California parole scheme for indeterminate

9   offenses does create a liberty interest.

10          In sum, the governing statute provides that the Board *must grant*
           *parole* unless it determines that public safety requires a lengthier
11          period of incarceration for the individual because of the gravity of
           the offense underlying the conviction. (Pen.Code, § 3041, subd.
12          (b).) And as set forth in the governing regulations, the Board *must*
           *set a parole date* for a prisoner unless it finds, in the exercise of its
13          judgment after considering the circumstances enumerated in
           section 2402 of the regulations, that the prisoner is unsuitable for
14          parole. (Cal.Code Regs., tit. 15, § 2401.) Accordingly, parole
           applicants in this state *have an expectation that they will be*
15          *granted parole* unless the Board finds, in the exercise of its
           discretion, that they are unsuitable for parole in light of the
16          circumstances specified by statute and by regulation.

17   In re Rosenkrantz,  29 Cal. 4th 616, 654, 128 Cal. Rptr. 2d 104, 138 (2003) (emphasis added).

18          It is difficult to conceive of words which mirror the requirements of the Allen

19   mandatory-act-in light-of-satisfied-factual-predicates paradigm more than the emphasized words

20   of Rosenkrantz.  Indeed, Allen and Rosenkrantz use the same terminology, i.e. "presumption" of

21   release and "expectation" of release.  These are the words of liberty interest creation.  It is not

22   material that great discretion is vested within the administrative agency granting parole.  Allen

23   supra.  See also the post-Dannenberg case of In re DeLuna,126 Cal. App. 4th 585, 591, 24 Cal.

24   Rptr. 3d 643, 647 (2005):

25          Penal Code section 3041, subdivision (b) requires the Board to "set
           a release date unless it determines that the gravity of the current
26          convicted offense or offenses, or the timing and gravity of current

8

1  or past convicted offense or offenses, is such that consideration of
   public safety requires a more lengthy period of incarceration for
2  this individual, and that a parole date, therefore, cannot be fixed at
   this meeting." *This statute creates a conditional liberty interest for*
3  *a prospective parolee.* (Cf. <u>Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th at p.
   661, 128 Cal.Rptr.2d 104, 59 P.3d 174; <u>McQuillion v. Duncan</u> (9th
4  Cir.2002) 306 F.3d 895, 901-902.) (emphasis added)[1]

5        The undersigned can only find that California law is in disarray on the subject of

6  liberty interest created by the California parole statutes.  <u>Dannenberg</u> did not overrule

7  <u>Rosencrantz</u>, and implied overrulings are extremely disfavored.  <u>Scheiding v. Gen. Motors</u>, 22

8  Cal. 4th 471, 478, 93 Cal. Rptr. 2d 342, 346 (2000).  Indeed, California cases after <u>Dannenberg</u>

9  continue to find a liberty interest and cite <u>Rosencrantz.</u>  Therefore, <u>Biggs</u> should not, and cannot,

10 be cast aside based on the ambiguities in California law unless the Ninth Circuit so holds.[2]

11       For the reasons discussed above, the court finds that petitioner has a liberty

12 interest in parole.

13       B.  <u>Insufficient Evidence/ Individual Consideration</u>

14       Petitioner argues that in reversing the BPT's decision finding him suitable, the

15 Governor failed to give petitioner individualized and full consideration regarding who he was at

16 the time of the offense compared to who he is now.  Petitioner separately argues that the

17 Governor's decision is not supported by sufficient evidence.  As far as this court can tell, these

18 arguments encompass each other.  Accordingly, they will be addressed below in the context of

19 whether the Governor's decision was supported by sufficient evidence.

20 \\\\\\

---

22  [1]  <u>Dannenberg</u> did find that California prisoners had no liberty interest in a *uniform* parole
    date, 34 Cal. 4th at 1098 (n.18), 23 Cal. Rptr. 3d at 443 (citing <u>Rosenkrantz</u>); however, this is a
23  far cry from holding that the parole scheme as a whole does not create a conditional liberty
    interest.

24  [2]  Other district court cases continue to find a liberty interest in the California parole
    statute after <u>Sass</u>.  <u>See Lewis v. Solis</u>, 2005 WL 3454137 (N.D.Cal. 2005); <u>Murilla v. Perez</u>,
25  2005 WL 2592420 (C.D. Cal. 2005); <u>Rodriguez v. Campbell</u>, 2005 WL 1335711 (E.D. Cal. 2005
    MCE JFM); <u>but see</u> <u>Trevino v. Mendoza-Powers</u>, 2005 WL 2436471 (E.D. Cal. 2005 (OWW
26  SMS).

Under California law, in considering whether to reverse a decision by the BPT the Governor considers the same factors which the parole authority is required to consider. Cal. Const., art. V, § 8(b); Cal. Penal Code § 3041.2; In re Rosenkrantz, supra, 29 Cal.4th at p. 660, 128 Cal.Rptr.2d at 142. Accordingly, this court will apply the same standard used in evaluating the sufficiency of evidence to support decisions by the BPT in its evaluation of the sufficiency of evidence of the Governor's decision.

"In the parole context, the requirements of due process are met if 'some evidence' supports the decision [by the BPT]." Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). The evidence underlying the board's decision must have some indicia of reliability. Id.

In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

1    The Ninth Circuit stated that "[a] continued reliance in the future on an

2  unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

3  contrary to the rehabilitative goals espoused by the prison system and could result in a due

4  process violation."  334 F.3d at 917.

5    The court now examines the decisions by the BPT and the Governor.  On August

6  19, 1991, the BPT found petitioner suitable for parole.  Exhibit H attached to respondent's

7  exhibit C.  On October 18, 1991, Governor Wilson reversed this decision.  Exhibit H, attached to

8  respondent's Exhibit C.  On August 20, 2001, petitioner had his twelfth subsequent parole

9  suitability hearing.  Exhibit D p. 5, attached to respondent's exhibit C.  On December 13, 2001,

10  Governor Davis reversed this decision.  Exhibit C, attached to respondent's Exhibit C.

11    The facts of petitioner's commitment offense are summarized in the probation

12  report, respondent's Exhibit G, as well as discussed at the 2001 hearing.  Petitioner was

13  seventeen years old at the time he committed the murder.  Petitioner and his crime partner, Davis,

14  schemed to find a man and woman couple to murder.  They also planned to rape the woman.

15  Petitioner speculated that Davis came up with this idea after a stranger attempted to rape Davis's

16  girlfriend.  On June 28, 1977, petitioner and Davis attempted to enact this plan, but the intended

17  victims fled.

18    On July 3, 1977, petitioner and Davis drove to a park in Escondido and found the

19  victim Michael Windsor and his girlfriend.  Petitioner approached and ordered them out of their

20  car.  Windsor complied as petitioner kept a shotgun pointed at him.  Windsor's girlfriend fled

21  and petitioner shot and killed Windsor, rolled him on his back and took his keys and wallet.

22  Davis took the weapon and shot at the girl.  Petitioner and Davis left the park, but later returned

23  to find the girl.

24    The Governor found petitioner unsuitable for parole because the offense was

25  carried out in an execution style manner.  Cal. Code Regs. tit. 15, § 2402(c)(1)(B) (that the

26  \\\\\

11

1   offense was carried out in execution-style manner tends to demonstrate unsuitability).  In

2   particular the Governor found,

> After careful planning, Mr. Johnson committed an execution-style
> murder of a random 17-year-old boy.  He committed this heinous
> crime in order to help his crime partner complete the kidnap, rape
> and murder of the victim's young female companion.  His actions
> demonstrate a complete disregard for human life and suffering.

6   Exhibit C attached to respondent's exhibit C.

7           The characterization of petitioner's crime as an execution style-murder is

8   accurate.  However, as discussed above, the 2001 hearing was petitioner's twelfth suitability

9   hearing.  It had been 24 years since petitioner committed the murder.  As found by the 2001

10  hearing panel, petitioner had done everything he could in prison to better himself.  Under these

11  circumstances, the nature of the offense had lost any predictive value and the continued reliance

12  on it to find petitioner unsuitable violated due process.  Accordingly, the court finds that this

13  factor was not supported by some evidence.

14          It would be easy to simply let the Governor's decision stand.  The murder was

15  extremely callous, insensitive and reflecting no respect for the value of human life.  A sentence

16  of life without parole could easily be justified on moral grounds.  However, the prosecutor was

17  unwilling or unable to proceed with special circumstances for a life without parole sentence, and

18  petitioner, not charged or convicted with special circumstances, was sentenced to life *with the*

19  *possibility of parole*.  This remains the fact whether the Governor or this court agrees with the

20  prosecutor's determination.  California law therefore requires that there be some *meaningful*

21  possibility of parole.  Clearly, that sentence could not be transformed into a life without parole

22  sentence, but that, in effect, was what the Governor did by simply relying on the nature of the

23  crime—twelve hearings having transpired.  Whether made by express words or hidden design, a

24  decision to never allow petitioner to be paroled is contrary to law.

25          As recognized by the BPT, the inhumanity of the murder will never change; it will

26  not minimize in its shockingness over time.  A later decision that the murder "wasn't so bad"

1  will never be made, and if it were, such a decision would be clearly arbitrary.  Therefore, if the

2  Governor's decision to deny parole based on the nature of the crime is permitted to stand,

3  contrary to the parole statutes which logically measure parole eligibility on the reformation of the

4  prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a

5  possibility.  The parole statutes do not vest the Governor with the power to resentence petitioner.[3]

6  The remainder of the factors considered demonstrate conclusions, which on their

7  face would stand as a basis for denying parole; however, when the evidentiary surface is

8  scratched, there is simply a dearth of "some evidence" to support the conclusions.

9  The 2001 panel found that petitioner posed no unreasonable risk of danger to

10  society or threat to public safety if released from prison.  Exhibit D, p. 55, attached to

11  respondent's exhibit C.  In support of this conclusion, the panel found that petitioner had no

12  juvenile record of assaulting others.  Id., Cal. Code Regs. tit. 15, § 2402(d)(1) (lack of record of

13  assaulting others as a juvenile demonstrates suitability).  The panel also found that petitioner's

14  institutional behavior indicated an enhanced ability to function within the law upon release.  Id.,

15  Section 2402(d)(9) (institutional activities demonstrate suitability).  In support of this finding, the

16  panel observed that petitioner had obtained A.A. and A.S. degrees while incarcerated and was 30

17  units short of a B.A. degree.  Id.  In addition, petitioner had continuously participated in self-help

18  and therapy programming.  Id.  Petitioner had obtained vocational programming including a

19  license to be an air frame engine mechanic certified by the FAA.  Id., p. 56.  In addition, two

20  psychiatric reports were in favor of petitioner's release on parole.  Id., p. 56.

21  The panel found that petitioner lacked a significant criminal history.  Id. p. 56; §

22  2402(d)(6) (lack of significant criminal history of violent crime demonstrates suitability).  The

23  panel found that petitioner's advanced age reduced his probability of recidivism.  Id. p. 56; §

24  _____

25  [3]  Obviously, the seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing.  But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming
26  petitioner's record in prison is exemplary).

2402(d)(7) (prisoner's present age reduces probability of recidivism).  The panel also found that petitioner had realistic parole plans which included a job and family support in the Bakersfield area.  Id. p. 56; section 2402(d)(8) (realistic parole plans demonstrate suitability).  In addition, the panel found that petitioner showed signs of remorse.  Id. p. 56; § 2402(d)(3) (indication of remorse demonstrates suitability).

In conclusion, BPT Commissioner Daly told petitioner, "I think that you've done a very good job.  You know, when you were 17, I don't think there's any way you'll ever get around that being a horrible, horrible crime.  But I do think that you have done everything that you can to better yourself."  Id., p. 59.

In reversing the 2001 decision by the BPT, the Governor found petitioner unsuitable on the following grounds.  First, he found that petitioner had an unstable social history.  Cal. Code Regs. tit. 15, § 2402(c)(3) (unstable social history tends to show unsuitability).  In particular, the Governor stated:

> According to Mr. Johnson, he had a turbulent home life and behavioral problems that required psychological treatment.  He began experimenting with marijuana at age 12 and seriously abusing alcohol at age 16.  Mr. Johnson's substance abuse led to two arrests for being a minor in possession of alcohol.  Mr. Johnson stated that he had also been stopped by police several times for driving while under the influence, but was never arrested or charged.  He stated that he had been drinking heavily during the 48 hours immediately prior to the murder.

Exhibit C, attached to respondent's exhibit C.

In finding that petitioner had an unstable social history, the Governor relied heavily on petitioner's drinking problem.  At the 2001 hearing, petitioner admitted that he had a drinking problem at the time of the offense.  Exhibit D p. 13 attached to respondent's exhibit C.  At the 2001 hearing, the BPT acknowledged that petitioner had been attending Alcoholics Anonymous (AA) since 1991.  Exhibit D p. 23, attached to respondent's exhibit C.  That petitioner had a drinking problem as a juvenile was never going to change.  The Governor did not find that petitioner had a current drinking problem, apparently based on petitioner's ten year

attendance of AA.  Under these circumstances, using the unchanging factor of petitioner's

drinking problem to find him unsuitable for parole violated his right to due process.

The Governor also found that petitioner had an unstable social history based on

his use of marijuana.  At the 2001 hearing, petitioner testified that he experimented with

marijuana when he was 13 but that he did not like it so he did not "mess" with it.  Exhibit D, p.

22, attached to respondent's exhibit C.  This limited use of marijuana was not "some evidence"

in support of the Governor's finding that petitioner had an unstable social history.

The Governor also found that petitioner had an unstable social history based on

his turbulent home life.  At the 2001 hearing, petitioner testified that his father left his family

when he was little.  Exhibit D p. 16, attached to respondent's exhibit C.  Petitioner had contact

with his father when he got to be around 15 or 16 years old.  Exhibit D p. 17, attached to

respondent's exhibit C.  Petitioner testified that his current relationship with his siblings could be

better if they were not alcoholics.  Exhibit D p. 19, attached to respondent's exhibit C.  Petitioner

had also dropped out of school in the ninth grade.  Exhibit D p. 20, attached to respondent's

exhibit C.

Petitioner was obviously not responsible for his father leaving the family when he

was young.  Nor was petitioner responsible for the alcohol abuse of his siblings.  For these

reasons, the Governor inaccurately characterized these circumstances as demonstrating an

unstable social history by petitioner.  That petitioner dropped out of school also did not support a

finding that petitioner had a history of unstable or tumultuous relationships with others.  The

court is unsure of the basis for the Governor's statement that petitioner required psychological

treatment as a juvenile.

For the reasons discussed above, the court finds that the Governor's finding that

petitioner had an unstable social history was not supported by some evidence.

Finally, the Governor found that petitioner had not taken sufficient responsibility

for his crime:

1   Mr. Johnson has yet to take full responsibility for his role in this
    vicious crime.  At the August 2001 parole suitability hearing, Mr.
2   Johnson attempted to minimize his culpability by stating that he
    thought it was "like a game" and that "I didn't believe that any of it
3   would happen."  Mr. Johnson has made similar comments in the
    past.  However, the facts indicate that Mr. Johnson affirmatively
4   carried out the crime exactly as it had been planned.  He was
    holding the shotgun and could have stopped the crime at any time.
5   Once the victim had been shot, Mr. Johnson callously rifled
    through the victim's pockets while he was still moving.  Mr.
6   Johnson attempted to commit an identical crime just a week earlier.
    I believe Mr. Johnson lacks insight into his own criminality and
7   requires additional counseling to better understand the magnitude
    of his offense and the causative factors leading to it.

8

9   Exhibit C attached to respondent's exhibit C.

10          At the 2001 hearing, petitioner told the panel that at the time of the crime,

11  committing it seemed like a game and he did not think it would happen:

12          Commissioner Moore: You said it was kind of a game when you
            completed these crimes.  How do you feel, what was the, you
13          know, the process with that is what he asked?

14          Petitioner: Like I said in the beginning, it didn't, I didn't think that
            any of it was going to happen in the first place.  And everything
15          leading up to it was, it almost seemed impossible to happen, and all
            the things that, I mean, it was almost like a game.  It was like he
16          was pushing me and I was pushing him, we were seeing how far
            one another would go.  I didn't think you know, that we would
17          actually go as far as we did.  Maybe that was a bad choice of words
            on my part but, I mean, I didn't see any, any conclusion to what we
18          were, what we had planned to do.

19  Exhibit D, pp. 43-44 attached to respondent's exhibit C.

20          Petitioner's statements that committing the crime seemed like a game and that he

21  did not think it would happen was not an attempt by him in 2001 to minimize his culpability for

22  the crime.  Rather, in making these statements, petitioner was obviously attempting to describe

23  what he felt at the time of the crime.  Petitioner was not stating presently that he believed murder

24  plots were a game, or that life exists in some video game meaninglessness.

25          During the 2001 hearing, petitioner did not in any way deny or attempt to

26  minimize his culpability for the crime.  Petitioner told the panel that he felt ashamed for what he

1   did, and that he felt bad that he had taken the victim away from his family.  Exhibit D, p. 8

2   attached to respondent's exhibit C.  Petitioner told the panel that he had attempted to make

3   amends by changing himself.  Exhibit D, p. 9 attached to respondent's Exhibit C.  Petitioner told

4   the panel that he was more mature, that he thought for himself, and he knew the difference

5   between right and wrong.  Exhibit D p. 9 attached to respondent's Exhibit C.

6           Finally, the Governor found that petitioner required additional therapy to gain a

7   better understanding of the magnitude of his offense.  The BPT relied on two psychological

8   reports in finding petitioner suitable for parole.  The first report, prepared in 1999, stated that

9   petitioner should be expected to "deepen his ethical and moral self-awareness, and to expand his

10  understanding of the impact of the crime on the victims and their families.  Johnson might

11  consider for example, learning more about different religions and their ideals of right and wrong,

12  and continuing in self-help groups."  Respondent's Answer, Exhibit I.  This report also stated

13  that petitioner appeared to "accept and to know that taking another's life was wrong.  There

14  appears some degree of remorse for the act."  The second psychological report, dated August

15  2001, is an addendum to the earlier report.  Id.  This report stated that petitioner exhibited no

16  psychiatric pathology and concluded,

17          Now, 24 years later, the subject is observed as having
                demonstrated the ability to plan and reach goals that are within
18          societies mores.  Violence potential, in the state of sobriety, is
                evaluated as average for the male in the free community.  When
19          released, the Subject should continue Alcoholics Anonymous,
                abstain from alcohol and related drugs, and fulfill his affiliation
20          needs through social interaction within groups that are positive and
                law abiding.
21  Id.

22          At the 2001 hearing, the panel also mentioned an addendum dated September 16,

23  stating that petitioner demonstrated significant positive change in the area of moral and ethical

24  self-awareness compared to the earlier report.  Exhibit D p. 28 attached to respondent's exhibit

25  C.  It is unclear to this court whether the September 16 addendum referred to by the panel is the

26  addendum referred to immediately above.  In any event, both of petitioner's latest psychological

1  evaluation supported the suitability finding.  Neither report stated that petitioner required

2  additional therapy.  Under these circumstances, the Governor's conclusion that petitioner

3  required additional therapy to better understand the magnitude of his offense was not supported

4  by some evidence.

5          For the reasons discussed above, this court concludes that the Governor's decision

6  to reverse the 2001 BPT's finding of parole suitability was not supported by some evidence.

7  Because the denial of this claim by the California Supreme Court was not a reasonable

8  application of clearly established Supreme Court authority, the petition should be granted as to

9  this claim.

10         Accordingly, IT IS HEREBY ORDERED that:

11         1.  Petitioner's August 15, 2005, motion for discovery is denied as unnecessary;

12         2.  Petitioner's September 29, 2005, summary judgment motion is vacated;

13         IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

14  habeas corpus be granted on grounds that the Governor's decision to reverse the 2001 decision

15  by the Board of Prison Terms finding petitioner suitable for parole was not supported by some

16  evidence; petitioner be given a release date, assuming his prison record has remained materially

17  unchanged since the 2001 suitability hearing.

18         These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20  days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  shall be served and filed within ten days after service of the objections.  The parties are advised

24  \\\\\

25  \\\\\

26  \\\\\

1 that failure to file objections within the specified time may waive the right to appeal the District

2 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3 DATED:   1/19/06

4

5                                                  /s/ Gregory G. Hollows

6                                          _____
                                           GREGORY G. HOLLOWS
7                                          UNITED STATES MAGISTRATE JUDGE

8 ggh:kj
  john385.157
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26